**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

DIAMOND BLAIR, et al.[1],          )
                                   )
            Plaintiffs,            )
                                   )
        v.                         )          No. 4:23-CV-00189 AGF
                                   )
BRIAN BOYER, et al.,               )
                                   )
            Defendants.            )

**MEMORANDUM AND ORDER**

This matter is before the Court on the motion of self-represented plaintiff Diamond Blair, an inmate at Crossroads Correctional Center (CRCC), for leave to commence this action without prepayment of the required filing fee. [ECF No. 2]. Having reviewed the motion and the financial information submitted in support, the Court has determined that plaintiff Diamond Blair lacks sufficient funds to pay the entire filing fee and will assess an initial partial filing fee of $8.37. *See* 28 U.S.C. § 1915(b)(1). Additionally, after review of the complaint and supplemental documents submitted by plaintiff, the Court will strike plaintiff William Blair from this action, partially dismiss the complaint and order the Clerk to issue process or cause process to be issued on the non-frivolous portions of the complaint.

---

[1] Plaintiff Diamond Blair has signed his brother's name, William Blair, to the complaint "by proxy." William Blair is currently incarcerated at Jefferson City Correctional Center (JCCC). Because plaintiff Diamond Blair is proceeding pro se, he cannot represent his brother, William Blair, another pro se litigant in this action. *See* 28 U.S.C. § 1654 (stating that in all United States courts, "he parties may plead and conduct their own cases personally or by counsel"); *Jones ex rel. Jones v. Correctional Medical Services, Inc.*, 401 F.3d 950, 952 (8th Cir. 2005) (stating that "a non-attorney…may not engage in the practice of law on behalf of others"); *Iannaccone v. Law*, 142 F.3d 553, 558 (2nd Cir. 1998) (stating that "because pro se means to appear for one's self, a person may not appear on another's behalf in the other's cause…A person must be litigating an interest personal to him"). Consequently, William Blair will be stricken from this action.

**28 U.S.C. § 1915(b)(1)**

Pursuant to 28 U.S.C. § 1915(b)(1), a prisoner bringing a civil action in forma pauperis is required to pay the full amount of the filing fee. If the prisoner has insufficient funds in his prison account to pay the entire fee, the Court must assess and, when funds exist, collect an initial partial filing fee of 20 percent of the greater of (1) the average monthly deposits in the prisoner's account, or (2) the average monthly balance in the prisoner's account for the prior six-month period. After payment of the initial partial filing fee, the prisoner is required to make monthly payments of 20 percent of the preceding month's income credited to his account. 28 U.S.C. § 1915(b)(2). The agency having custody of the prisoner will forward these monthly payments to the Clerk of Court each time the amount in the prisoner's account exceeds $10.00, until the filing fee is fully paid. *Id.*

In support of his motion for leave to proceed in forma pauperis, plaintiff Diamond Blair submitted a copy of his certified inmate account statement. [ECF No. 4]. A review of plaintiff's account from the relevant period indicates an average monthly deposit of $41.84. Plaintiff has insufficient funds to pay the entire filing fee. Accordingly, the Court will assess an initial partial filing fee of $8.37.

**Standard of Review**

This Court is required to review a complaint filed in forma pauperis and must dismiss it if it is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B). An action is frivolous if it "lacks an arguable basis in either law or fact." *Neitzke v. Williams*, 490 U.S. 319, 328 (1989). An action fails to state a claim upon which relief may be granted if it does

not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

A claim is facially plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly,* 550 U.S at 556). Although a plaintiff need not allege facts in painstaking detail, the facts alleged "must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal,* 556 U.S. at 678. Determining whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing court to draw upon judicial experience and common sense. *Id*. at 679. The court must assume the veracity of well-pleaded facts but need not accept as true "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* at 678 (citing *Twombly,* 550 U.S. at 555).

This Court liberally construes complaints filed by laypeople. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "Liberal construction" means that "if the essence of an allegation is discernible," the court should "construe the complaint in a way that permits the layperson's claim to be considered within the proper legal framework." *Solomon v. Petray*, 795 F.3d 777, 787 (8th Cir. 2015) (quoting *Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004)). However, even pro se complaints must allege facts that, if true, state a claim for relief as a matter of law. *Martin v. Aubuchon*, 623 F.2d 1282, 1286 (8th Cir. 1980). Federal courts are not required to assume facts that are not alleged, *Stone*, 364 F.3d at 914-15, nor are they required to interpret procedural rules so as to excuse mistakes by those who proceed without counsel. *See McNeil v. United States,* 508 U.S. 106, 113 (1993).

## The Complaint

Plaintiff Diamond Blair, an inmate at Crossroads Correctional Center (CRCC), filed the instant civil rights action pursuant to 42 U.S.C. § 1983 on February 16, 2023. [ECF No. 1]. He names the following individuals as defendants in this action, relative to events which purportedly occurred during his incarceration at Eastern Reception Diagnostic and Correctional Center (ERDCC): Brian Boyer (Functional Unit Manager); Anne Precythe (Director of the Missouri Department of Corrections (MDOC)); Jeff Norman (Deputy Division Director); Richard Adams (Warden); Crystal Schmemitz (Central Transfer Administrator); Michael Miller (Case Manager, ERDCC); Edmund Jennings (Case Manager ERDCC); Timothy Sellars (Sergeant); Tim Freeman (Assistant Warden); Chris Neiman (Constituent Services Officer). Plaintiff sues defendants in their individual and official capacities.[2]

In his complaint for damages and injunctive relief, plaintiff alleges that on August 16, 2022, he was assigned to the Protective Custody (PC) Unit at ERDCC in Bonne Terre, Missouri, in Cell 1A-102. He states that on that afternoon, Correctional Officer Ava Smith came to his cell and ordered him to go with him into the Housing Unit A/B side of the sallyport. [ECF No. 1, p. 8]. Once there, he was met by Correctional Officer Timothy Sellars who told plaintiff he was transferring him into the Administrative Segregation (Ad-Seg) Unit. During the transfer plaintiff was told by Officer Smith that he was being placed under investigation, referred to as "UNIV Status," per the orders of the shift commander, which plaintiff took to mean defendant Boyer.

---

[2]The Court notes that in support of his complaint, plaintiff has attached three declarations from inmates incarcerated at ERDCC. He has also submitted as a supplement to his complaint, ECF No. 8, a declaration from inmate David Gary. The Court does not accept discovery documents unless attached to a motion or memorandum. *See* Local Rule 3.02. These documents will be stricken from the Court record. To the extent that plaintiff attempts to offer "evidence" in his complaint from these affidavits, the Court will not accept such "evidence." *See also* Fed.R.Civ.P.7(a). *Pleadings Allowed; Form of Motions and Other Papers.*

Plaintiff was placed in Housing Unit 2D-118 of the Ad-Seg Unit. He asserts that he stayed in that cell until November 7, 2022, after which time he was transferred to cell 1B-108. *Id.*

Plaintiff asserts that during the next two weeks he submitted several "kites" and verbal requests to unnamed individuals asking that he be provided with Informal Resolution Request (IRR) forms.[3] He claims that he was provided the forms approximately ten (10) days after being placed in Ad-Seg, on or about August 26, 2022, and that he filed an IRR that same date contesting his transfer. [ECF No. 1, pp. 84-85]. The log number on the IRR is ERDCC-22-1402. Plaintiff has attached a copy of the IRR to his complaint.[4]

In his IRR plaintiff states that he believes he was placed in Ad-Seg by defendant Boyer in retaliation for "filing complaints regarding safety concerns of GP [general population] inmates housed with PC [protective custody] inmates. . ."[5] In his IRR, plaintiff asserts that prior being placed into Ad-Seg, his name had been placed on a "Kick-Out"[6] list by defendant Boyer and placed in the control bubble's window so that all inmates could see as "an act of intimidation and warning." [ECF No. 1, p. 9].

On December 27, 2022, plaintiff received a response to his August 26, 2022, Informal Resolution Request. [ECF No. 1, p. 83]. The Court is unable to read who wrote the response; however, the findings from ERDCC indicate that the prison found plaintiff's IRR to be a duplicate

---

[3]Plaintiff states that his fiancé called and emailed case managers Michael Miller, Sarah Miller, Stacey Jones, and Functional Unit Managers Brian Boyer and LeAnn Crews requesting IRR forms as well.

[4]Pursuant to Federal Rule of Civil Procedure 10(c), a copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.

[5]Plaintiff has not provided the Court with the complaints, or IRRs, he allegedly filed regarding the safety concerns of the inmates in the PC Unit.

[6]Plaintiff describes a "Kick-Out" list as a list of names of inmates that staff wanted removed the PC Unit.

IRR to ERDCC 22-1352. Therefore, plaintiff's IRR was denied. Plaintiff has not attached a copy of his prior IRR, 22-1352 to his complaint, nor has he attached any response to this IRR. Accordingly, the Court is unable to ascertain when his prior IRR was filed, what his factual assertions were in the prior IRR or what the response was to the IRR.

Plaintiff alleges that he was issued a conduct violation (CDV) on or about September 8, 2022, while he was in Ad-Seg. He has attached a copy of the CDV to his complaint. [ECF No. 1, p. 81]. The CDV was issued by defendant Boyer for a violation of Regulation 19.1 – An action that threatens custody. It states:

> During a camera review, offender Blair, Diamond #186595 was observed coming out of A-Wing into the A/B sallyport and running over to B-Wing door to throw a laundry bag into B-Wing. Upon retrieving the bag, it was discovered to be filled with several canteen items. This places offender in violation of 19.1 Creating a Disturbance, 24.4 Contraband and 30.1 Out of Bounds.
>
> Note: Property removal attached and all items were forwarded to the property room.
>
> Violation delayed due to investigation of further wrong doing [sic].

*Id.*

On September 12, 2022, defendant Case Manager Edmund Jennings held a hearing with plaintiff as to the CDV issued on September 8, 2022. On the Corrective Action Report filled out that same day, [ECF No. 1, p. 69], he indicated that plaintiff did not request any witnesses to testify at the hearing, and defendant Jennings read plaintiff his rights prior to the hearing. *Id.* Plaintiff, however, requested videotape evidence of the charges against him, as well as a copy of the CDV, which he stated he had not yet received. He also claimed that he had not received a copy of the Temporary Administrative Segregation Confinement (TASC) Order confining him to Ad-Seg.

After reviewing the CDV, Edmunds found plaintiff guilty of the CDV and recommended that he be restricted from phone calls for sixty (60) days, be put on thirty (30) days canteen

restriction (be given hygiene only) and be given twenty (20) days of Disciplinary Segregation (Dis-Seg). Functional Unit Manager Michael Miller approved the restrictions with the added modification of referring plaintiff to Ad-Seg for attempting to introduce contraband into Ad-Seg. Miller also indicated that the contraband should be disposed of. *Id.*

In his complaint, plaintiff complains that he was wrongfully found guilty at the hearing, because there was not enough evidence in the CDV to find him guilty of the infractions. [ECF No. 1, pp. 9-13]. He claims that although the CDV states that "a camera" review observed plaintiff in violation of the regulations, the CDV fails to indicate who observed plaintiff violating the rules, *i.e.,* who was watching the camera. Plaintiff also objects to his finding of guilt because the CDV also fails to indicate who found the alleged contraband and linked it to plaintiff. Plaintiff argued that the contraband did not belong to him, and he was not the individual who was acting on the purported video. Plaintiff claims that he was denied use of the video at the hearing because Jennings told him that video evidence is only used for "major CDVs." [ECF No. 1, p. 12].

Plaintiff asserts, in a conclusory manner, that defendants Boyer, Jennings and Miller have "an unwritten policy and procedure to refer inmates on the PC Unit who receive conduct violations to Dis-Seg and Ad-Seg." [ECF No. 1, p. 12].  He claims that once these inmates are in Dis-Seg, the inmate is made to serve "indefinite hole time" if he should seek a PC assignment after he is released from Ad-Seg and referred to the PC Review Committee. Plaintiff alleges that defendant Boyer, Miller, Jennings and Sellars chair and sit on the PC Review Committee and intentionally prolong an inmate's "hole time" because they do not want that inmate in the PC Unit. *Id.*

On September 19, 2022, plaintiff filed an IRR, ERDCC 22-1536, asserting that he had been transferred to Ad-Seg on August 16, 2022, where he was assigned to TASC per the orders of defendant Boyer with no reason provided except he was "UNIV." He alleged that he had not been

provided with a TASC notice at that time. Additionally, plaintiff claimed that he had appeared before the Ad-Seg Committee on August 18, 2022,[7] and he was informed by committee members that they did not know why plaintiff was under investigation. Plaintiff purportedly told the Ad-Seg Committee members that he could not defend himself and his placement in Ad-Seg if he did not know why he had been placed there.

In his IRR, plaintiff additionally asserted that he believed that his CDV hearing was a violation of his due process rights. He claimed that the hearing was presided over by defendant Jennings, who answered to defendant Boyer. When plaintiff told Jennings he had not received a copy of the CDV, Jennings said he would have to ask his boss, Boyer, about that. Additionally, defendant Miller signed off as the acting Functional Unit Manager on his CDV, and plaintiff asserted that Miller also answered to defendant Boyer.

On an unidentified date plaintiff received a response to his September 19, 2022, Informal Resolution Request. [ECF No. 1, p. 78]. The response is unsigned, however, under the heading "Findings," it states the following:

> Your IRR and all pertinent information/documentation has been received and reviewed. Upon review, it was found that there is not sufficient evidence to support your claims that you did not receive a copy of the conduct violation report or the orders placing you in TASC. You stated in your complaint that you were told you were placed on TASC due to being UNIV, so you were aware of why you were being placed on TASC status. Why you are on UNIV is not information that is given out when an investigation is active and the TASC orders do not state the reason for being UNIV, they only state the reason you are being placed on TASC. In regards to your Due Process rights being violated by FUM Boyer, CCM Jennings and CCM Miller, according to SOP19-1.6 Offender Accountability Program, "the staff member who writes the specific conduct violation report form. . .any staff member actively involved in conducting an investigation prior to the corrective hearing shall not be a corrective hearing officer or on the adjustment board." It is best practice that those same quoted individuals are also not approving officials for corrective action reports, to avoid potential issues regarding possible due process

---

[7]This claim is in contravention to plaintiff's assertion, *supra*, wherein he alleged that he was not able to grieve his placement in Ad-Seg for several weeks after his placement there due to his inability to get an IRR form.

violations. Additionally, according to the above SOP, "For minor conduct violations, the conduct violation report form, the corrective action report form, and all pertinent information shall be forwarded to the unit manager or designee for an initial review and recommendation and then to the assistant warden or designee for final approval. . .the unit manager or designee has the option to recommend the following: approve the findings and recommended corrective actions. . .modify the corrective actions." CCM Jennings was well within policy acting as the hearing officer being the case manager that is over the violation in the housing unit and CCM Miller was will within policy acting as the FUM and modifying the corrective action recommendations. According to these findings, you were afforded your proper due process rights throughout the conduct violation process, you were found guilty according to the available evidence and the decision was upheld by supervisory staff. Due to the findings noted above, your IRR is denied.

Plaintiff filed a Grievance on November 17, 2022, relating to ERDCC 22-1536. [ECF No.1, p. 74]. He protested that "telling" him "UNIV" failed to comply with the MDOC regulations which required defendant Boyer to provide plaintiff a TASC notice. He argued that he had a right to know "why" he was being investigated. Plaintiff alleged that he was given a "falsified" TASC notice months after he left the PC Unit. He further argued that neither Jennings, Boyer nor Miller should be able to sit in any hearings related to him.

On December 21, 2022, a "Warden's Response" was issued in response to plaintiff's grievance. [ECF No. 1, p. 75]. The response, signed by Grievance Officer Sarah Miller, states:

Mr. Blair, I am in receipt of your grievance dated June 28, 2022. You state that you never received a copy of your Temporary Administrative Segregation Confinement Order. You also believe that because the violation was written by the Functional Unit Manager, his subordinates should not have held the hearing for it and signed as the designee for the Functional Unit Manager. You also believe those staff cannot serve as part of the Administrative Segregation Hearings or Protective Custody Hearings.

Having Reviewed your Informal Resolution Request, Grievance, and other pertinent information available to me, I found the response at the Informal Resolution Request level adequately addressed your complaint. There is no evidence that you did not receive a copy of your Temporary Administrative Segregation Confinement Order. Policy was adhered to in regards to the due process of your violation. Additionally, the staff that wrote the conduct violation and held hearings for your violation was not part of the Protective Custody

Committee to assess your protective custody needs. This should resolve your complaint at the Grievance level.

Plaintiff alleges that on September 27, 2022, he appeared before the PC Review Committee which was chaired by defendant Boyer. [ECF No. 1, p. 14]. Plaintiff does not indicate who else was sitting on the PC Review Committee at that time,[8] and he has not provided the Court with a copy of his Classification Hearing Form.[9] Plaintiff states that in the PC Review Hearing defendant Boyer told him that he would not be returning to the PC Unit. *Id.* Boyer allegedly continued plaintiff's stay in the Ad-Seg Unit at that time for thirty (30) days.[10]

Plaintiff claims that he filed an IRR complaint against Boyer on September 28, 2022, "for placing obstacles to PC admission." *Id.* Plaintiff has not provided the Court with a copy of this IRR. He purportedly mailed the complaint to Deputy Division Director Jeff Norman. However, plaintiff claims that his IRR to Norman was never responded to. *Id.*

Plaintiff had a PC Committee Hearing on October 25, 2022, in front of Michael Miller, Edmund Jennings and Mathew McFarland. [ECF No. 1, p. 15]. Plaintiff has not provided the Court with a copy of his Classification Hearing Form, however, in his complaint he claims that Miller asked him at the hearing what he wanted to do. [ECF No. 1, pp. 14-15]. Plaintiff asserts that he asked for transfer to the PC Unit for both himself and his brother. Plaintiff alleges that Miller looked through four pages of his listed enemies, counting through the enemies plaintiff had at each MDOC institution. Miller allegedly stated, "Your brother won't be here, and you're not going back

---

[8]Plaintiff made the conclusory allegation in his complaint that the PC Review Committee is often made up of Boyer, Miller, Jennings and sometimes Sellars. [ECF No. 1, p. 13].

[9]Plaintiff provided the Court with a Classification Hearing Form for his Protective Custody Hearing that was held on January 17, 2023. [ECF No. 1, p. 72].

[10]The Court takes judicial notice that in plaintiff's IRR, ERDCC 22-1802, he asserted that when he was in front of the PC Review Committee on September 27, 2022, he signed a PC request form and was then told that he was going to be assigned to Ad-Seg for an additional (30) days pending PC review. [ECF 1, p. 15].

to PC. We don't want you over there. So, get that out of your mind." Plaintiff claims that Miller

then typed in a submission to transfer plaintiff to another institution. Miller gave plaintiff an

additional ninety (90) days in Ad-Seg. Plaintiff believes that he was given the additional time

because he requested a transfer to the PC Unit. *Id.*  Plaintiff also claims he was not given a fair and

impartial hearing due to the PC Review Committee's makeup including Miller and Jennings.

On October 26, 2022, plaintiff filed an IRR, ERDCC 22-1803, asserting that he had sought

a copy of his TASC Order and "subsequent CDV" report for approximately ten (10) weeks.

However, on that same date, he had received a "falsified TASC Order" and "erroneous CDV"

which he believed deprived him of due process. Plaintiff sought dismissal of his CDV and transfer

back to the PC Unit. [ECF No. 1, pp. 86-87].

On an unidentified date plaintiff received a response to his September 19, 2022, Informal

Resolution Request. [ECF No. 1, p. 78]. The response is unsigned, however, the findings from

ERDCC indicate that the prison found plaintiff's IRR to be a duplicate IRR to several other IRRs

filed by plaintiff: ERDCC 22-1352, ERDCC 22-1536 and ERDCC 22-1783. The IRR was denied.

On November 17, 2022, plaintiff filed an IRR, ERDCC 22-1783, asserting that he was

being kept in Ad-Seg indefinitely as a punishment and as retaliation for seeking to be returned to

the PC Unit. [ECF No. 1, pp. 95-96]. In his IRR plaintiff also asserted that in a hearing held before

defendants Miller, Jennings and Mathew McFarland on October 25, 2022, relative to his PC needs,

he was told by defendant Miller that "You're not going to PC. . .We're not going to let you waive

the people there who declared you an enemy. . .Do you want to waive enemies at other camps?

See where we can send you. . .You have 3 pages of listed enemies every 5 camp. . ." Plaintiff

alleges that when he refused to waive his enemies, pointing out that he had previously had a hit

ordered on him by prison threat groups, "he was arbitrarily assigned a continued 90 days to the

Ad-Seg Unit." He asserts that white inmates with similar or more serious CDVs were sentenced to less time in the Ad-Seg Unit than he was.

On January 12, 2023, plaintiff received a response to his November 17, 2022, Informal Resolution Request. [ECF No. 1, p. 97]. The Court is unable to ascertain the signatures on the response. However, under the heading "Findings," it states:

> Your IRR and all pertinent information/documentation has been received and reviewed. Upon review it was found that there is not sufficient evidence to support your claims that the HU#1 staff and PC Committee were discriminatory in any way when sanctioning your violation and/or assigning you to Ad-Seg/TASC. The Corrective Hearing Officer was within policy when assigning sanctions. According to the Rules of Conduct and Corrective Sanctions reference documents, a 19.1 is a level 2 violation and can be sanctioned as the CHO sanctioned you. According to SOP19-1.6 Offender Accountability Program, Ad-Seg is a classification staff action and may be recommended by the CHO and when deemed appropriate, more than one sanction/action may be applied to a single violation. The referral to Ad-Seg was made during the review process, after the corrective hearing, and that and the original sanctioning was approved by the Warden/designee. As far as your TASC/Ad-Seg confinement, policy supports placement of PC offenders into TASC/Ad-Seg during the time that the PC Committee investigates the offender's needs for PC. It also supports that an offender remain in Ad-Seg for PC needs when the offender cannot be placed into the PCU or General Population. According to the evidence, the PC Committee cannot place you into the PCU or into into GP, due to you having unwaived enemies there. You have been submitted for transfer to an institution where you have no unwaived enemies, so you can be placed into a less restrictive environment in their PCU. The above findings suggest that you were not discriminated against and were afforded your proper due process rights throughout the conduct violation process, that policy was followed in regards to your Ad-Seg and PC assignments and that staff have done what they can to ensure that your PC needs were appropriately addressed. It was also found that this complaint is a duplicate/expanded version of a prior complaint you have already made, ERDCC22-1536. This is prohibited by policy and any further complaints that are deemed as duplicate/expanded complaints of this same issue will be responded to as such. Due to these findings your IRR is denied.

[ECF No. 1, p. 96].

On November 18, 2022, plaintiff filed an IRR, ERDCC 22-1900, asserting that he had been transferred to the Ad-Seg Unit on August 16, 2022, and placed on TASC without due process. Similarly, he alleged defendant Boyer gave him a CDV on September 8, 2022 and had defendants

Jennings and Miller hold a hearing without due process on the CDV on September 12, 2022. [ECF No. 1, pp. 86-87]. Plaintiff further alleged that on September 27, 2022, he appeared before the PC Review Committee, including in front of Committee Chairman Boyer, and he asked for placement back into PC. Boyer told him that he would not be returning to PC at that time, and he assigned plaintiff to thirty (30) days of Ad-Seg while review was being done on his PC request.

On October 25, 2022, plaintiff again appeared before the PC Review Committee, and this time, defendant Miller was the Acting Chairman, along with defendant Jennings and Mathew McFarland. Miller asked Blair what his PC needs were, and Blair outlined why he needed PC, including listing his enemies at various prisons throughout the State of Missouri. Miller purportedly told plaintiff, "You are not going back to PC, get that out of your mind. . . Your brother won't be here." Plaintiff alleges that Miller "punished" him with an additional ninety (90) days of Ad-Seg and placed plaintiff on the transfer list. Plaintiff asserts that because he had filed complaints against Miller, Boyer and Jennings previously, these actions were retaliatory and could place plaintiff's life at risk by facilitating transfer to a different facility. *Id.* Again, plaintiff has failed to provide the Court with a copy of his PC Review Committee Hearing Classification form. Although as noted, *supra,* it appears he attempted to waive several individuals in PC who had designated him on their enemy list at that time. *See* Plaintiff's IRR ERDCC 22-1783. [ECF No. 1, pp. 95-96]. Miller purportedly told plaintiff that he would not be allowed to waive the enemies in PC. *Id.*

On an unidentified date plaintiff received a response to his November 18, 2022, Informal Resolution Request. [ECF No. 1, p. 92]. The response is unsigned, however, the findings from ERDCC indicate that the prison found plaintiff's IRR to be a duplicate IRR to several other IRRs filed by plaintiff: ERDCC 22-1783 and ERDCC 22-1802. The IRR was denied.

On November 21, 2022, plaintiff filed an IRR, ERDCC 22-1802, asserting that he had been denied fair and impartial hearings on three occasions in 2022: (1) August 16, 2022, when plaintiff was first placed in the Administrative Segregation Unit/on TASC; (2) September 27, 2022, when plaintiff was in front of the Protective Custody Review Committee and "coerced by defendant Boyer" to sign a PC request form and Boyer then assigned plaintiff to Ad-Seg for thirty (30) days pending PC review[11]; and (3) October 25, 2022, when plaintiff was in front of the PC Review Committee and the decision to continue plaintiff's Ad-Seg assignment was already printed on the form.

On an unidentified date, plaintiff received a response to his November 21, 2022, Informal Resolution Request. [ECF No. 1, p. 99]. The response is unsigned, however, the findings from ERDCC indicate that the prison found plaintiff's IRR to be a duplicate IRR to several other IRRs filed by plaintiff: ERDCC 22-1352, ERDCC 22-1536 and ERDCC 22-1783. The IRR was denied.

Plaintiff had a PC Committee Hearing on January 17, 2023, in front of Committee Chair Brian Boyer, and members Michael Miller, Timothy Sellars and Ashley Downs. [ECF No. 1, p. 15]. He asserts that prior to the hearing, defendant Sellars addressed him at his cell door and told him he had a "beef" with him. *Id*. He said, "I think you are pressing people in my PCU. Can I prove it? No. But I think you were. That's why I don't think you belong over there."

---

[11]Plaintiff additionally alleges that Boyer repetitively had his cell searched to have him removed from the PC Unit. There is no indication in the record that the cell search elicited a CDV of any kind. As an inmate, plaintiff does not have a liberty interest in being free from cell searches. *See Banks v. Beard*, No. 2:03CV659, 2006 WL 2192015, at *16 (W.D. Pa. Aug. 1, 2006) (prisoner "possesses no liberty interest in being free from cell searches"); *see also Kulhanek v. Griffith*, No. 4:17-CV-02431-JAR, 2020 WL 2747301, *6 (E.D.Mo.2020).

Plaintiff has provided his Classification Hearing Form relating to the PC Review Committee Hearing from January 17, 2023. [ECF No. 1, p. 72]. The Hearing Form provided by plaintiff indicates that the prior hearing was held on October 25, 2022[12], where he stated:

> I have a green light on me. Every time I go to population, I always get stabbed. I have enemies at this camp. I do not know all their names, but there is a history of me being assaulted. I do not feel like I am being afforded a fair hearing.

The summary of findings from the Hearing Form indicates that plaintiff has one unwaived enemy in General Population, four unwaived enemies in Ad-Seg and one unwaived enemy in the PC Unit.[13] The Committee concluded that there was no viable housing option for plaintiff at ERDCC other than Ad-Seg. Thus, transfer seemed appropriate; however, plaintiff was awaiting approval for transfer from "CTA."[14] The Committee recommended transfer, but until plaintiff could be transferred, the recommendation was to keep plaintiff in Ad-Seg. *Id.*

Plaintiff asserts that he was denied the right to impartial decisionmakers at his PC Review Committee Hearings because they were made up of the same individuals who assessed his CDV hearing. [ECF No. 1, pp. 17-18]. Additionally, defendant Boyer told plaintiff at his January 17, 2023, PC Review Committee Hearing, "You make it personal by filing your complaints." [ECF No. 1, p. 17]. Plaintiff also points to Jennings' assertion at his CDV hearing where he stated, "Boyer is the boss," as evidence that Jennings was unable to act with impartiality. *Id.*

---

[12]Plaintiff failed to provide the Court with copies of his PC Review Committee Hearing Forms from his July and October 2022 hearings. Additionally, plaintiff has not indicated if he had hearings during the months of November and December of 2022.

[13]Plaintiff disagrees with the assertion on the Hearing Form that he had an unwaived enemy in the PC Unit. He claims that his "listed enemy in the PC Unit, David Gary, was transferred into the Ad-Seg Unit in January of 2025. [ECF No. 1, p. 49]. He asserts that Gary told him that defendant Miller placed plaintiff's name on his enemy list as a "means to block" plaintiff and his brother from being transferred into the PC Unit. Plaintiff does not indicate how and when he had the means to speak to inmate David Gary when they were both single celled in the Ad-Seg Unit.

[14]The acronym "CTA" stands for Central Transfer Authority.

Plaintiff additionally claims that defendants Boyer, Miller and Sellars placed plaintiff in an "imminently dangerous" situation by falsifying a CDV against him, falsely declaring an individual in PC his enemy to block his return to PC, continuing plaintiff's stay in Ad-Seg and placing him on the transfer list. [ECF No. 1, pp. 18-19].

Last, plaintiff asserts that defendants Boyer, Miller, Jennings and Sellar treat Caucasian inmates with preferential treatment with respect to assigning them to the PC Unit. [ECF No. 1, pp. 19-20]. He claims that some white inmates are encouraged to sign enemy waivers so that they may transfer from Ad-Seg into the PC Unit. These inmates may have been assigned to Ad-Seg for CDVs worse than plaintiff's, however, they are still moved from the Ad-Seg Unit and into the PC Unit while black inmates are denied movement into the PC Unit. *Id.*

In his motion for injunctive relief, plaintiff seeks to stop the named defendants from retaliating against him in an arbitrary manner by "transferring him into an imminently dangerous environment" into General Population from Ad-Seg. [ECF No. 1, p. 25]. He states that he has multiple enemies and faces a high risk of being assaulted or murdered if he is forced into General Population at ERDCC. However, plaintiff was transferred to Jefferson City Correctional Center (JCCC) in Jefferson City, Missouri and placed in Ad-Seg on February 7, 2023. He was transferred to Crossroads Correctional Center (CRCC) in Cameron, Missouri, on or about April 4, 2023, and at that time he was placed in Ad-Seg at CRCC. [ECF Nos. 11 and 12]. Thus, his request for injunctive relief is moot and will be denied.

### Discussion

Because plaintiff's factual assertions are somewhat difficult to discern due to the breadth of the allegations in his complaint, the Court will attempt to summarize them here. Plaintiff alleges three due process violations, including that he was denied due process under the Fourteenth

Amendment: (1) when he was transferred from the PC Unit to the Ad-Seg Unit by Officer Timothy Sellars, per the alleged orders of Commander Boyers, on August 16, 2022, based on UNIV status at ERDCC; (2) during his September 12, 2022 CDV hearing at ERDCC; and (3) during his stay in Ad-Seg at ERDCC.

Plaintiff alleges he was subjected to retaliation in violation of the First Amendment at ERDCC: (1) when he was moved from the PC Unit on August 16, 2022 and placed in the Ad-Seg Unit at the direction of Commander Boyer; (2) when he was found guilty of a false conduct violation on September 12, 2022; (3) when he was not transferred to the PC Unit after he served his time in Dis-Seg and Ad-Seg on the CDV on September 27, 2022, October 25, 2022 and January 17, 2022; and (4) when he was subjected to a retaliatory transfer to JCCC.

Last, plaintiff alleges that he was discriminated against based on his race, African American. He claims that defendants Boyer, Miller, Jennings and Sellar treat Caucasian inmates with preferential treatment with respect to assigning them to the PC Unit. And he additionally seeks a preliminary injunction to stop the named defendants from retaliating against him in an arbitrary manner by "transferring him into an imminently dangerous environment" into General Population at ERDCC from Ad-Seg. He states that he has multiple enemies at ERDCC and faces a high risk of being assaulted or murdered if he is forced into General Population.

Because plaintiff has sued defendants in both their individual and official capacities, the Court will address the official capacity claims prior to addressing the individual capacity claims.

### A. Official Capacity Claims Against Defendants

Plaintiff sues the named defendants in their official capacities. In an official capacity claim against an individual, the claim is actually "against the governmental entity itself." *See White v. Jackson*, 865 F.3d 1064, 1075 (8th Cir. 2017). Thus, a "suit against a public employee in his or

her official capacity is merely a suit against the public employer." *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999). *See also Brewington v. Keener,* 902 F.3d 796, 800 (8th Cir. 2018) (explaining that official capacity suit against sheriff and his deputy "must be treated as a suit against the County"); *Kelly v. City of Omaha, Neb.*, 813 F.3d 1070, 1075 (8th Cir. 2016) (stating that a "plaintiff who sues public employees in their official, rather than individual, capacities sues only the public employer"); and *Elder-Keep v. Aksamit*, 460 F.3d 979, 986 (8th Cir. 2006) (stating that a "suit against a public official in his official capacity is actually a suit against the entity for which the official is an agent"). Here, each of these defendants is alleged to be employed by the State of Missouri. As such, the official capacity claims against them are claims against the state, itself. These claims fail for two reasons.

First, 42 U.S.C. § 1983 "provides for an action against a 'person' for a violation, under color of law, of another's civil rights." *McLean v. Gordon,* 548 F.3d 613, 618 (8th Cir. 2008). *See also Deretich v. Office of Admin. Hearings*, 798 F.2d 1147, 1154 (8th Cir. 1986) (stating that "[§] 1983 provides a cause of action against persons only"). However, "neither a State nor its officials acting in their official capacity are 'persons' under § 1983." *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 (1989. *See also Calzone v. Hawley*, 866 F.3d 866, 872 (8th Cir. 2017) (explaining that a "State is not a person under § 1983"); and *Kruger v. Nebraska*, 820 F.3d 295, 301 (8th Cir. 2016) (explaining that "a state is not a person for purposes of a claim for money damages under § 1983").

In this case, plaintiff is suing for money damages.[15] The State of Missouri is not a 42 U.S.C. § 1983 "person" for the purposes of such claims. As he is missing an essential element of a § 1983

---

[15]Although plaintiff additionally sued to block his transfer to another MDOC facility, he was first transferred to JCCC on February 7, 2023, and then to CRCC on April 4, 2023; thus, his request for injunctive relief is moot.

action, the official capacity claims must be dismissed. Second, plaintiff's claims against defendants in their official capacities, and therefore the claims against the State of Missouri, are barred by the doctrine of sovereign immunity.[16] *See Webb v. City of Maplewood,* 889 F.3d 483, 485 (8th Cir. 2018) ("The Eleventh Amendment protects States and their arms and instrumentalities from suit in federal court"). There are two "well-established exceptions" to the sovereign immunity provided by the Eleventh Amendment. *Barnes v. State of Missouri*, 960 F.2d 63, 64 (8th Cir. 1992). "The first exception to Eleventh Amendment immunity is where Congress has statutorily abrogated such immunity by clear and unmistakable language." *Id.* The second exception is when a state waives its immunity to suit in federal court. *Id.* at 65. A state will be found to have waived its immunity "only where stated by the most express language or by such overwhelming implications from the text as will leave no room for any other reasonable construction." *Welch v. Tex. Dep't of Highways & Pub. Transp.,* 483 U.S. 468, 473 (1987). Neither exception is applicable in this case.

The first exception is inapplicable because 42 U.S.C. § 1983 – under which this case arises – does not revoke a state's Eleventh Amendment immunity from suit in federal court. *See Will*, 491 U.S. at 66 ("We cannot conclude that § 1983 was intended to disregard the well-established immunity of a State from being sued without its consent"); and *Quern v. Jordan*, 440 U.S. 332, 341 (1979) ("[W]e simply are unwilling to believe ... that Congress intended by the general

---

[16]"Sovereign immunity is the privilege of the sovereign not to be sued without its consent." *Va. Office for Prot. & Advocacy v. Stewart,* 563 U.S. 247, 253 (2011). The Eleventh Amendment has been held to confer sovereign immunity on an un-consenting state from lawsuits brought in federal court by a state's own citizens or the citizens of another state. *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974). *See also Webb v. City of Maplewood*, 889 F.3d 483, 485 (8th Cir. 2018) ("The Eleventh Amendment protects States and their arms and instrumentalities from suit in federal court"); and *Egerdahl v. Hibbing Cmty. Coll.,* 72 F.3d 615, 618-19 (8th Cir. 1995) ("Generally, in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment"). The Eleventh Amendment bars suit against a state or its agencies for any kind of relief, not merely monetary damages. *Monroe v. Arkansas State Univ.,* 495 F.3d 591, 594 (8th Cir. 2007) (stating that district court erred in allowing plaintiff to proceed against state university for injunctive relief, and remanding matter to district court for dismissal).

language of § 1983 to override the traditional sovereign immunity of the States"). The second exception is also inapplicable because the State of Missouri has not waived its immunity in this type of case. *See* RSMo § 537.600 (explaining that sovereign immunity is "in effect," and providing exceptions relating to the "negligent acts or omissions by public employees arising out of the operation of motor vehicles ... within the course of their employment," and regarding "[i]njuries caused by the condition of a public entity's property").

In short, sovereign immunity prevents plaintiff from suing the State of Missouri for any type of relief, be it monetary or injunctive. Furthermore, he has not demonstrated that an exception to sovereign immunity is present here. Therefore, for this reason as well, his claims against defendants in their official capacities are subject to dismissal.

To the extent that plaintiff seeks injunctive relief, he must demonstrate the liability of the State of Missouri for harming him. *See Nix v. Norman,* 879 F.2d 429, 432 (8th Cir. 1989); *Kelly*, 813 F.3d at 1075. Such liability may attach if the constitutional violation "resulted from (1) an official ... policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise." *Mick v. Raines*, 883 F.3d 1075, 1079 (8th Cir. 2018). *See also Marsh v. Phelps Cty.,* 902 F.3d 745, 751 (8th Cir. 2018) (recognizing "claims challenging an unconstitutional policy or custom, or those based on a theory of inadequate training, which is an extension of the same"). Thus, there are three ways in which plaintiff can prove the liability of the State of Missouri.

First, plaintiff can show the existence of an unconstitutional policy. "Policy" refers to "official policy, a deliberate choice of a guiding principle or procedure made by the [governmental] official who has final authority regarding such matters." *See Corwin v. City of Independence, Mo.,* 829 F.3d 695, 700 (8th Cir. 2016). For a policy that is unconstitutional on its face, a plaintiff needs no other evidence than a statement of the policy and its exercise. *Szabla v. City of Brooklyn, Minn.,*

486 F.3d 385, 389 (8th Cir. 2007). However, when "a policy is constitutional on its face, but it is asserted that a [governmental entity] should have done more to prevent constitutional violations by its employees, a plaintiff must establish the existence of a 'policy' by demonstrating that the inadequacies were a product of deliberate or conscious choice by the policymakers." *Id.* at 390. "A policy may be either a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the [governmental entity's] governing body." *Angarita v. St. Louis Cty.,* 981 F.2d 1537, 1546 (8th Cir. 1992).

Second, plaintiff can establish a claim of liability based on an unconstitutional "custom." To do so, plaintiff must demonstrate:

1)  The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

2)  Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

3)  That plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Johnson v. Douglas Cty. Med. Dep't,* 725 F.3d 825, 828 (8th Cir. 2013).

Finally, plaintiff can assert a liability claim against a governmental entity by establishing a deliberately indifferent failure to train or supervise. *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 388 (1989) (explaining that inadequate training may serve as the basis for 42 U.S.C. § 1983 liability only when "the failure to train amounts to deliberate indifference"). To show deliberate indifference, a plaintiff must prove that the governmental entity "had notice that its procedures were inadequate and likely to result in a violation of constitutional rights." *See Jennings v. Wentzville R-IV Sch. Dist.,* 397 F.3d 1118, 1122 (8th Cir. 2005). Ordinarily, this is done by a

plaintiff alleging a "pattern of similar constitutional violations by untrained employees." *See S.M. v. Lincoln Cty.,* 874 F.3d 581, 585 (8th Cir. 2017).

Plaintiff does not need to specifically plead the existence of an unconstitutional policy or custom. *See Crumpley-Patterson v. Trinity Lutheran Hosp.,* 388 F.3d 588, 591 (8th Cir. 2004). However, at a minimum, the complaint must allege facts supporting the proposition that an unconstitutional policy or custom exists. *Doe ex rel. Doe v. Sch. Dist. of City of Norfolk,* 340 F.3d 605, 614 (8th Cir. 2003).

In this case, plaintiff asserts, in a conclusory manner, that defendants Boyer, Jennings and Miller had "an unwritten policy and procedure" to refer inmates on the PC Unit who received conduct violations to Dis-Seg and Ad-Seg. [ECF No. 1, p. 12].  He claims that once these inmates are in Dis-Seg the inmate is made to serve "indefinite hole time" if he should seek a PC assignment after he is released from Ad-Seg and is referred to the PC Review Committee. Plaintiff alleges that defendant Boyer, Miller, Jennings and Sellars sit on the PC Review Committee and intentionally prolong an inmate's "hole time" because they do not want that inmate in the PC Unit. *Id.*

First, plaintiff has not established the existence of an "unconstitutional policy" of placing inmates at ERDCC who received conduct violations in "the hole" indefinitely. While he has argued that he was denied due process with respect to being placed in Ad-Seg and not being allowed back into the PC Unit at ERDCC, he has failed to present facts regarding a custom or policy of placing inmates at ERDCC in "the hole," or in Ad-Seg or Dis-Seg, indefinitely. Certainly, his assertions do not allow the Court to infer that such a policy is unconstitutional, either in its entirety or as applied to him. Rather than present allegations regarding a policy or the acts of policymakers, plaintiff's facts – such as they are – focus on the actions of individuals who he believes are acting against *only him* for improper reasons.

22

Second, plaintiff has not demonstrated that he was harmed by an unconstitutional custom, as he has not shown the "existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the [State of Missouri's] employees," much less that policymakers were deliberately indifferent to or tacitly authorized such misconduct. Far from describing a "persistent pattern of unconstitutional misconduct," plaintiff's allegations do not adequately describe even a single instance in which a constitutional violation occurred.

Except for his own conclusory allegations, plaintiff has not presented any facts or supporting allegations for the proposition that there was a custom, policy or practice that any of the named defendants, the MDOC or the State of Missouri required inmates, other than himself, to serve indefinite hole time after he received a CDV while he was in the PC Unit. As noted, *infra*, plaintiff was sentenced to forty-two (42) days for his CDV that was interspersed between Dis-Seg and Ad-Seg for his CDV. He then received thirty (30) additional days in Ad-Seg while an investigation into his request to be admitted into the PC Unit occurred. And he received more time in Ad-Seg while he was awaiting transfer to another prison due to his own safety. Additionally, he has not named any other inmates at ERDCC who this policy was allegedly was applied to.

Third, plaintiff has not properly alleged that the State of Missouri was deliberately indifferent in failing to train or supervise its employees. To show deliberate indifference, plaintiff must prove that the state "had notice that its procedures were inadequate and likely to result in a violation of constitutional rights." Typically, this is done by alleging a "pattern of similar constitutional violations by untrained employees." As noted above, plaintiff's facts do not show even a single constitutional violation, let alone a pattern.

Finally, to the extent that plaintiff might seek to hold the State of Missouri liable for the actions of its employees, the Court notes that a governmental entity cannot be held liable under 42

U.S.C. § 1983 simply because it employs a tortfeasor. *See A.H. v. City of St. Louis, Mo.,* 891 F.3d 721, 728 (8th Cir. 2018) ("In an action under § 1983, a [governmental entity] ... cannot be liable on a respondeat superior theory").

For all the reasons discussed above, plaintiff has failed to state official capacity claims against defendants. Therefore, the official capacity claims must be dismissed.

## B. Individual Capacity Claims

### 1. Allegations Against Defendants Anne Precythe, Jeff Norman, Richard Adams, Crystal Schemitz, Tim Freeman and Chris Neiman

Plaintiff's individual capacity claim against defendants Anne Precythe, Jeff Norman, Richard Adams, Crystal Schemitz, Tim Freeman and Chris Neiman are subject to dismissal because he has not established that these defendants are liable for a constitutional violation.

Liability in a § 1983 case is personal. *Frederick v. Motsinger*, 873 F.3d 641, 646 (8th Cir. 2017). In other words, "[g]overnment officials are personally liable only for their own misconduct." *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015). As such, § 1983 liability "requires a causal link to, and direct responsibility for, the alleged deprivation of rights." *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990). *See also Kohl v. Casson*, 5 F.3d 1141, 1149 (8th Cir. 1993) (dismissing plaintiff's excessive bail claims because none of the defendants set plaintiff's bail, and therefore, "there can be no causal connection between any action on the part of the defendants and any alleged deprivation" of plaintiff's rights). To that end, a plaintiff must allege facts connecting the defendant to the challenged action. *See Bitzan v. Bartruff*, 916 F.3d 716, 717 (8th Cir. 2019).

The complaint does not provide any facts to show how these defendants were directly responsible for a violation of plaintiff's constitutional rights. "A federal complaint must contain the "who, what, when and where" of what happened, and each defendant must be linked to a

24

particular action." *Drummer v. Corizon Corr. Health Care*, 2016 WL 3971399, at *1 (E.D. Mo. July 25, 2016). There are no factual assertions made against these defendants in the complaint. For these reasons, plaintiff's allegations against these defendants are subject to dismissal.

## 2. Fourteenth Amendment Due Process Claims

### a. Due Process Violations that Allegedly Occurred Between August 16, 2022, and September 27, 2022

"In order to prevail on a Fourteenth Amendment due process claim, [plaintiff] must first demonstrate that he was deprived of life, liberty, or property by government action." *Phillips v. Norris*, 320 F.3d 844, 846 (8th Cir. 2003). Plaintiff does not allege that he was denied of life or property, so he must identify a liberty interest to maintain his due process claim. *Id.* at 847. In *Sandin v. Conner*, the Supreme Court found that prisoners have a liberty interest, protected by the Due Process Clause, in avoiding conditions of confinement that impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. 472, 484 (1995). There is no bright-line rule as to what constitutes an atypical and significant hardship. *Smith v. McKinney*, 954 F.3d 1075, 1081 (8th Cir. 2020) ("The Supreme Court has acknowledged 'the difficulty of locating the appropriate baseline' by which to measure what constitutes an atypical and significant hardship, but it has not resolved the issue." (quoting *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005))). However, courts should consider both "[t]he duration and degree of restrictions" to determine "whether a change in conditions imposes such a hardship." *Id.* at 1080 (quoting *Hamner v. Burls*, 937 F.3d 1171, 1180 (8th Cir. 2019), as amended (Nov. 26, 2019)).

To the extent plaintiff is claiming a due process violation because he was denied a specific review procedure in front of specific persons, his argument is misguided. Plaintiff does not have a liberty interest in the procedures by which the State of Missouri believes it can best determine how

25

he should be confined. *Phillips*, 320 F.3d at 847; *see also Olim v. Wakinekona*, 461 U.S. 238, 250 (1983) ("Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement."); *Griffin-El v. Delo*, 34 F.3d 602, 604 n.3 (8th Cir. 1994) (inmate does not have a liberty interest in a specific procedure).

A prisoner has no constitutionally protected liberty interest in remaining in a less restrictive prison environment. *Freitas v. Ault*, 109 F.3d 1335, 1338 (8th Cir. 1997). The Eighth Circuit has consistently held that administrative and disciplinary segregation are not atypical and significant hardships. *Portley–El v. Brill*, 288 F.3d 1063, 1065 (8th Cir. 2002). Additionally, prisoners do not have a liberty interest in avoiding temporary confinement in Ad-Seg or Dis-Seg because such punishment does not create an "atypical and significant hardship on an inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 482–86 (no "liberty interest" implicated by thirty (30) days in disciplinary segregation); *see also Ballinger v. Cedar County*, 810 F.3d 557, 562-63 (8th Cir. 2016) (no "liberty interest" implicated by one year in solitary confinement); *Orr v. Larkins*, 610 F.3d 1032, 1034 (8th Cir. 2010) (no "liberty interest" implicated by nine months in administrative segregation); *Phillips*, 320 F.3d at 847 (no "liberty interest" implicated by thirty-seven (37) days in isolation and loss of privileges of contact visitation, exercise, and chapel, even if demotion to segregation was without cause); *Portley-El*, 288 F.3d at 1065–66 (no "liberty interest" implicated by thirty (30) days in punitive segregation); *Kennedy v. Blankenship*, 100 F.3d 640, 642-43 & n.2 (8th Cir. 1996) (no "liberty interest" implicated by thirty (30) days in punitive segregation, which included the suspension of mail, telephone, visitation and commissary privileges).

The facts in plaintiff's complaint and supplemental documents make it clear his due process transfer claim to Ad-Seg on August 16, 2022, rests on a period of confinement that lasted from

then until he was released from his Ad-Seg sentence when he sought entrance into the PC Unit again on September 27, 2022. Thus, of this forty-two (42) day period, twenty (20) days of the confinement was in the Dis-Seg Unit, and twenty (20) days were in the Ad-Seg Unit. Plaintiff also was restricted from phone calls for sixty (60) days, put on thirty (30) days canteen restriction (given hygiene only), and during his time in Ad-Seg only allowed out of his cell five hours per week, not provided access to personal food or clothing, denied access to packages and denied access to contact visits. [ECF No. 1, p. 24].

The privileges he lost during this short interval of confinement is typical of the punishment associated with being placed in Ad-Seg and Dis-Seg. Thus, nothing about the facts surrounding plaintiff's forty-two (42) day period of confinement in segregation suggests that the conditions he endured caused him to suffer an "atypical and significant hardship," as required under *Sandin*. *See Sandin*, 515 U.S. at 482–86 (holding that the due process clause applies only when prison officials impose an "atypical and significant hardship on an inmate in relation to the ordinary incidents of prison life"); *Portley-El*, 288 F.3d at 1065–66 (holding that thirty (30) days in punitive segregation was not an atypical and significant hardship, under *Sandin*); *Kennedy*; 100 F.3d at 642-43 (holding that a prisoner did not have a liberty interest, and thus no procedural due process rights, in avoiding placement in punitive isolation for thirty (30) days); *Orr*, 610 F.3d at 1033-34 (stating that nine months in administrative segregation did not constitute an atypical and significant hardship); *Scott v. Jackson*, No. 5:15-CV-329-JLH, 2017 WL 3530146, at *5 (E.D. Ark. July 24, 2017), adopted 2017 WL 3529243 (E.D. Ark. Aug. 16, 2017), *appeal dismissed*, 2017 WL 8293563 (8th Cir. Nov. 13, 2017) (rejecting due process challenge to ADC's 72-hour "behavior control" policy).

Having thoroughly reviewed and liberally construed plaintiff's due process allegations with regard to his forty-two (42) day time period in Ad-Seg and Dis-Seg from August 16, 2022

through September 27, 2022, the Court concludes plaintiff has not established he was subjected to conditions of confinement that amounted to "the type of atypical, significant deprivation in which a state might conceivably create a liberty interest." *Sandin*, 515 U.S. at 485-86. Plaintiff's allegations therefore fail to state a colorable due process claim, and his claims relating to the forty-two (42) day time period will be dismissed.

### b. Due Process Violations that Allegedly Occurred between October 25, 2022, and January 17, 2023

Plaintiff started another "stint," in Ad-Seg as of September 27, 2022, when he was assigned to Ad-Seg by the PC Review Committee while they were undertaking an investigation as to whether he could be reassigned back to the PC Unit. However, this assignment to Ad-Seg was not disciplinary in nature, but rather was protective, as plaintiff had requested the assignment to PC rather than General Population because of purported enemies in General Population. When he came before the PC Review Committee again on October 25, 2022, plaintiff was informed that several PC inmates had placed him on their enemy list, and he would not be allowed to be placed in PC at that time.

Thus, he was placed on the transfer list to an outside MDOC agency and assigned to an additional ninety (90) days in Ad-Seg awaiting transfer. On January 17, 2023, plaintiff was informed by the PC Review Committee that his transfer had not yet been approved by the "CTA," but that he still had one unwaived enemy in General Population, four unwaived enemies in Ad-Seg and one unwaived enemy in the PC Unit.[17]

The facts of this case are similar to a case decided in the United States District Court for the Western District of Missouri - the case of *Bunch v. Long*, No. 06-4204-CV-C-NKL, 2006 WL

---

[17]Therefore, the only place he could remain at ERDCC was Ad-Seg until his transfer came through, which apparently occurred on February 7, 2023.

3717556 (W.D.Mo December 15, 2006).[18] Jeffery Bunch, an inmate at Jefferson City Correctional Center (JCCC) in Jefferson City, Missouri, asserted his twenty-two (22) month assignment to the Ad-Seg Unit in JCCC was in violation of the Fourteenth Amendment and lacked due process. Approximately a month after being transferred into JCCC, he was placed in the PC Unit due to having unwaived enemies in General Population. After Bunch received two CDVs within a two-month period, plaintiff was placed on TASC review and put in the Ad-Seg Unit while he was under investigation. After the investigation was completed and his hearing on his CDVs was held, his Ad-Seg time was extended for a short period of time. After Bunch had served approximately one-hundred-forty-five (145) days in Ad-Seg, between TASC review and the completion of his time served on his CDVs, it was determined that plaintiff had completed his time in Ad-Seg. However, plaintiff had enemies in both General Population and in the PC Unit, and thus, he was unable to be released from Ad-Seg. Thus, it was determined that Bunch would remain in Ad-Seg with a thirty (30) day review. A transfer request to a different institution was also submitted at that time. Unfortunately, within three months, the request to transfer Bunch to another level 5 institution was denied by the CTA. It was determined that Bunch had unwaived enemies in all level 5 institutions, thus, for his own safety he was kept in Ad-Seg at JCCC. *Bunch*, 2008 WL 5082861, *2 (W.D. Mo. Nov. 24, 2008). *See also Ballinger v. Cedar Co., Missouri*, 810 F.3d 557, 562 (8th Cir. 2016) (finding that keeping an inmate in single-celled Ad-Seg for approximately one year while awaiting transfer did not state a due process claim).

The Court in *Bunch* found that plaintiff could not show that he had been subjected to an atypical or significant hardship after being held in Ad-Seg at JCCC for twenty-two (22) months.

---

[18]Judge Laughrey adopted the Report and Recommendation of the Honorable William A. Knox. *See Bunch v. Long*, No. 06-4204-CV-C-NKL, 2008 WL 5082861 (W.D. Mo. Nov. 24, 2008).

*Id.* at 3-4. Additionally, the Court held that even assuming Bunch could show that he had been subjected to an atypical or significant environment he could not show a denial of due process as the record showed that he had been given regular (30 or 60 day) reviews while in As-Seg. *See Williams v. Norris*, 277 Fed. Appx. 647, 2008 WL 2003319 at *2 (8th Cir. 2008) (inmate given reviews at 60-day intervals at which he could make statements and present evidence was sufficient process as to his Ad-Seg confinement).

This Court agrees with holding in *Bunch v. Long and Ballinger v. Cedar Co., Missouri*. Plaintiff has not shown that he was denied due process or subjected to an atypical or significant hardship during the time he was held in Ad-Seg while he had unwaived enemies in both General Population and in the PC Unit and was awaiting transfer to a different institution. During this time period of what appears to have been eighty-five (85) days (October 25th through January 17th), he had reviews with the PC Review Committee as to his status and whether he could be moved to the PC Unit, and he was also awaiting transfer to another level 5 facility during this time for his safety and security.

The Court understands that plaintiff believes that defendants manipulated events to place his name on David Gary's enemy list to thwart his return to the PC Unit. Nonetheless, such an event speaks to alleged retaliation by the named defendants but not a lack of due process. Plaintiff has failed to allege that his stay in the Ad-Seg Unit was atypical and significant when compared to the General Population as required by *Sandin*. For these reasons, the Court finds plaintiff's due process claims subject to dismissal.

**3. First Amendment Retaliation Claims**

**a. Retaliatory Transfer to Administrative Segregation on August 16, 2022 and False CDV on September 8, 2022**

Plaintiff asserts that his transfer to Ad-Seg on August 16, 2022, was done by the shift commander, or defendant Boyer, in retaliation for plaintiff having filed an IRR, ERDCC 22-1352.[19] Plaintiff states that he and his fiancé had been filing complaints against what was going on in the PC Unit and against Boyer, regarding safety and security concerns about General Population inmates who were being housed with the PC Unit inmates, and Boyer was upset about his complaints because he oversaw the PC Unit. As a result, prior to plaintiff receiving his CDV, Boyer had made a "Kick Out" list, as an act of "intimidation and warning" and placed it in the control bubble window in the PC Unit. It was a list of all the offenders in the PC Unit Boyer wanted to get rid of, and plaintiff's name was on that list. Thus, plaintiff asserts that Boyer not only had him transferred him on UNIV status to Ad-Seg in retaliation for filing the IRR and complaints against him, but also issued a false conduct violation against him on September 8, 2022, as part of the retaliation.

First Amendment retaliation claims must include allegations that plaintiff engaged in protected activity and that defendant, to retaliate for the protected activity, took adverse action against plaintiff that would chill a person of ordinary firmness from engaging in that activity. *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004). The right to be free from retaliation for availing oneself of the grievance process is clearly established in the Eighth Circuit. *Santiago v. Blair*, 707 F.3d 984, 991 (8th Cir. 2013). *See also Nelson v. Shuffman*, 603 F.3d 439, 450 (8th Cir. 2010) (stating "that actions taken in retaliation for an inmate's filing of a grievance are actionable under 42 U.S.C. § 1983").

---

[19]Because the Court does not have a copy of ERDCC 22-1352, at this stage of the proceedings, the Court must take plaintiff's allegations as true that the IRR was filed prior to the time he was removed from the PC Unit on August 16, 2022.

"[T]he First Amendment right to petition for redress of grievances includes redress under established prison grievance procedures." *Dixon v. Brown*, 38 F.3d 379, 379 (8th Cir. 1994) (citing *Sprouse v. Babcock*, 870 F.2d 450 (8th Cir. 1989)). "Although the filing of a false disciplinary charge is not itself actionable under § 1983, the filing of a disciplinary charge becomes actionable if done in retaliation for the inmate's filing of a grievance." *Id.* An inmate need not show an independent injury apart from the false disciplinary charge. *Id.* "Because the retaliatory filing of a disciplinary charge strikes at the heart of an inmate's constitutional right to seek redress of grievances, the injury to this right inheres in the retaliatory conduct itself." *Id.*  To survive a motion to dismiss, allegations or retaliation must be more than speculative or conclusory. *Atkison v. Bohn,* 91 F.3d 1127, 1129 (8th Cir. 1996).

Plaintiff has provided enough to survive initial review for his claim against defendant Boyer in his individual capacity for retaliatory transfer to Ad-Seg on August 16, 2022, as well as an alleged false conduct violation charge against him. He has alleged that he filed complaints and an IRR against Boyer regarding safety and security concerns in the PC Unit. After this time, Boyer put up a "Kick-Out list" containing plaintiff's name on the bubble, indicating he wanted him out of the PC Unit, and then Boyer purportedly gave him a false CDV that plaintiff alleges was not supported by evidence. Given these allegations, which the Court must take as true, the Court will issue process against defendant Boyer in his individual capacity for these claims.[20]

**b.  Retaliatory Denial of Return to Protective Custody Unit on Three Occasions by PC Review Committee and Retaliatory Transfer to JCCC**

---

[20]In his complaint on page 18, plaintiff makes the conclusory statement that defendants Miller and Sellars were also involved in falsifying his CDV. [ECF No. 1, para. 157]. However, plaintiff has failed to provide any information as to these claims. The Court will not issue process on his claims against Miller or Sellars because his assertions lack information relating to their involvement in the alleged falsification of the CDV. *See Stone v. Harry*, 364 F.3d 912, 914-15 (8th Cir. 2004).

Plaintiff asserts that he was denied a return to the PC Unit on three occasions by the PC Review Committee: on September 27, 2022, October 25, 2022, and January 17, 2023. Plaintiff also claims he was subjected to a retaliatory transfer to JCCC. The Court will take up each of these claims in turn.

Plaintiff claims that defendants Boyer, Miller and Sellars placed plaintiff in an "imminently dangerous" situation by retaliating against him and blocking his return to the PC Unit after he filed grievances against them. Plaintiff points to several comments made by defendants Boyer, Sellars and Miller regarding his inability to return to the PC Unit such as: (1) Boyer telling him on September 27th that he would not be returning to PC at that time and assigning him to thirty (30) days of Ad-Seg while review was being done on his request to return to the PC Unit; (2) Michael Miller looking through four pages of plaintiff's enemy list and telling him on October 25th, "You are not going back to PC, get that out of your mind. . . Your brother won't be here."; (3) Michael Miller stating on October 25th, "You're not going to PC. . .We're not going to let you waive the people there who declared you an enemy. . .Do you want to waive enemies at other camps? See where we can send you. . .You have 3 pages of listed enemies every 5 camp. . ."; and (4) on January 17th defendant Sellars addressing him at his cell door and telling him he had a "beef" with him saying "I think you are pressing people in my PCU. Can I prove it? No. But I think you were. That's why I don't think you belong over there."  Plaintiff asserts that these comments are evidence of defendants' retaliatory behavior against him.

In addition to the verbal allegations, plaintiff also alleges that defendants Boyer, Miller, Jennings and Sellars acted in a retaliatory manner by keeping him from being transferred back into the PC Unit when they sat on the PC Review Committee. Plaintiff appears to allege that defendants retaliated against him because he filed grievances against defendants, and they collectively decided

to deny him a return to the PC Unit because of the filing of those grievances. Although some of the grievances plaintiff has attached to his complaint were filed after the alleged transfer to Ad-Seg (and decision to keep him in Ad-Seg), there are other IRRs and grievances purportedly filed by plaintiff that may have occurred prior to his transfer that the Court is not in possession of.

The Eighth Circuit has held that "a threat of retaliation is sufficient injury if made in retaliation for an inmate's use of prison grievance procedures" to sustain a claim of First Amendment retaliation. *Burgess v. Moore,* 39 F.3d 216, 218 (8th Cir.1994). This is true especially when the threats are ones of death or serious harm to an inmate's safety. *See, e.g., Burton v. Livingston*, 791 F.2d 97, 100–01 (8th Cir.1986) (holding that allegations that a prison guard retaliated against a prisoner by terrorizing him with threats of death, if proved, would constitute a violation of the prisoner's First Amendment rights); *Cooper v. Schriro*, 189 F.3d 781, 784 (8th Cir.1999) (per curiam) (holding that threats to an inmate's safety after his use of the prison grievance system supported a retaliation claim).

Plaintiff additionally claims that in 2015, he was subjected to two attacks in South Central Correctional Center (SCCC) in Licking, Missouri, that left him injured. *See, e.g., Blair v. Bowersox*, 929 F.3d 981 (8th Cir. 2019); [ECF No. 1, p. 45]. He alleges that he has over a hundred (100) enemies on his enemy list, and that defendants Boyer, Miller, Jennings and Sellars, who sat on the PC Review Committee, knew about the previous attacks, as well as his listed enemies at the various MDOC institutions, and they still indicated that they would not allow him to return to the PC Unit and recommended him for transfer to another MDOC institution where he had enemies because he had filed complaints against them previously. *Id*. In fact, plaintiff asserts that defendant Miller went so far as to place plaintiff on another inmate's enemy list who was in the PC Unit to thwart him from returning to the PC Unit at ERDCC.

Considering these allegations, the Court will issue process on defendants Boyer, Miller, Jennings and Sellar, in their individual capacities, for retaliatory denial of plaintiff's return to the PC Unit, as well as retaliatory transfer to JCCC.

### 4.  Equal Protection Argument Under the Fourteenth Amendment

Plaintiff asserts an Equal Protection race discrimination claim against defendants in their individual capacities under the Fourteenth Amendment. "The Equal Protection Clause generally requires the government to treat similarly situated people alike." *Klinger v. Dep't of Corrs.*, 31 F.3d 727, 731 (8th Cir. 1994). The dissimilar treatment of dissimilarly situated people does not violate equal protection. *Id*. As such, the first step in an Equal Protection case is determining whether the plaintiff has demonstrated that he or she was treated differently than others who were similarly situated. *In re Kemp*, 894 F.3d 900, 909 (8th Cir. 2018). Unless the plaintiff can make a threshold showing that he or she is similarly situated to those who allegedly received favorable treatment, the plaintiff does not have a viable equal protection claim. *Id*. The plaintiff must also show that "the different treatment is based upon either a suspect classification or a fundamental right." *Patel v. U.S. Bureau of Prison*s, 515 F.3d 807, 815 (8th Cir. 2008).

Here, plaintiff asserts that defendants Boyer, Miller, Jennings and Sellar treat *some* Caucasian inmates with preferential treatment with respect to assigning them to the PC Unit. He additionally claims that *some* white inmates are encouraged to sign enemy waivers so that they may transfer from Ad-Seg into the PC Unit. Moreover, he alleges that there are *some* inmates who are white who may have been assigned to Ad-Seg for CDVs worse than plaintiff's, however, they are still moved from Ad-Seg and into the PC Unit while *some* black inmates are denied movement into the PC Unit. [ECF No. 1, p. 13].

As discussed *supra*, to assert claims against defendants in their individual capacities, plaintiff must present a causal connection between the actions of each separate defendant, and the violation of one of plaintiff's constitutional rights. *See Mayorga v. Missouri,* 442 F.3d 1128, 1132 (8th Cir. 2006). "While all pleadings are to be construed to do substantial justice…the pleading must at a minimum be sufficient to give the defendant notice of the claim." *See Tatum v. Iowa,* 822 F.2d 808, 810 (8th Cir. 1987); and *Topchian v. JPMorgan Chase Bank, N.A.,* 760 F.3d 843, 848 (8th Cir. 2014) ("The essential function of a complaint under the Federal Rules of Civil Procedure is to give the opposing party fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved").

Plaintiff's allegations, however, do not give each defendant notice of the basis of his claim, but treats the individuals as a single group. Moreover, instead of providing factual allegations showing what each of these defendants did or did not do, plaintiff provides a legal conclusion and sets forth a recitation of the elements of an Equal Protection claim. This is not sufficient to state a claim against each of these defendants individually. *See Hamilton v. Palm*, 621 F.3d 816, 817-18 (8th Cir. 2010) (explaining that "[a] pleading that merely pleads labels and conclusions, or a formulaic recitation of the elements of a cause of action, or naked assertions devoid of factual enhancement will not suffice"); see also *Bitzan v. Bartruff*, 916 F.3d 716, 717 (8th Cir. 2019) (a plaintiff must allege facts connecting the defendant to the challenged action).[21]

---

[21]To the extent plaintiff is attempting to bring an Equal Protection claim against defendants in their official capacities by alleging a custom or policy of race discrimination, this claim would be barred by sovereign immunity. *Webb v. City of Maplewood*, 889 F.3d 483, 485 (8th Cir. 2018); *see also Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (state entities and officials acting in their official capacities are not "persons" against whom a § 1983 claim for monetary damages can be brought). Further, as plaintiff has been transferred to another correctional facility, he is not entitled to prospective injunctive relief. *See, e.g., Doe v. Board of Regents of Univ. of Neb.,* 509 F.Supp.3d 1133, 1141 (D. Neb. 2020) (discussing *Ex Parte Young* exceptions to sovereign immunity for Equal Protection claims).

For these reasons, plaintiff has not stated a claim under the Equal Protection Clause of the Fourteenth Amendment. Therefore, this claim is subject to dismissal.

### Request for Injunctive Relief

Plaintiff Diamon Blair requests "preliminary injunctive relief" and a "temporary restraining order" to stop the named defendants from retaliating against him in an arbitrary manner by "transferring him into an imminently dangerous environment" into General Population at ERDCC from Ad-Seg. [ECF No. 1, p. 25]. He states that he has multiple enemies and faces a high risk of being assaulted or murdered if he is forced into General Population. Plaintiff also seeks an injunction limiting defendants from transferring him to a different prison.

As noted *supra*, plaintiff was transferred from ERDCC to JCCC on February 7, 2023, and he was later transferred to CRCC and placed in Ad-Seg there. He claims that if he was forced into General Population at ERDCC, he "will be assaulted and/or possibly killed." Nonetheless, plaintiff fails to provide any additional information relative to his conclusory statement such as why he believes his life is in danger, why his request for the PC Unit at CRCC was denied, how many enemies he has in CRCC, and whether he believes any MDOC officials are blocking his entrance into the PC Unit at CRCC in an unconstitutional manner.

The Eighth Circuit has consistently held that a prisoner's transfer to a different facility where the alleged unlawful conduct does not exist, renders moot a prisoner's request for injunctive relief. *Hansler v. Kelley,* 783 F. App'x 639 (8th Cir. 2019) (affirming district court's ruling that claims for prospective injunctive relief became moot when prisoner transferred to another correctional facility); *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985) (dismissed as moot prisoner plaintiff's claim for injunctive relief to improve prison conditions because plaintiff was transferred to a different unit). *See also Small v. Wetzel*, 528 F. App'x 202, 208 (3d Cir. 2013)

(prisoner-plaintiff lacks standing to bring suit for prospective relief on religious freedom claims after transfer to a different facility).

In this case, plaintiff has been transferred to a different MDOC institution and he has not properly alleged that he is being retaliated by any MDOC officials at CRCC, provided any information indicating when or if he will be transferred from Ad-Seg into General Population, provided allegations that he has enemies at CRCC that wish him harm such that MDOC officials cannot protect him, nor indicated that MDOC officials are acting unconstitutionally. Without allegations such as these, the Court finds that plaintiff's requests for injunctive relief are moot, therefore such claims fail to state a claim for relief and will be denied.

### Motion for Appointment of Counsel

Before the Court is plaintiff Diamond Blair's motion for appointment of counsel. After considering the motion and the pleadings, the motion will be denied without prejudice.

There is no constitutional or statutory right to appointed counsel in civil cases. *Nelson v. Redfield Lithograph Printing*, 728 F.2d 1003, 1004 (8th Cir. 1984). In determining whether to appoint counsel, the Court considers several factors, including (1) whether the plaintiff has presented non-frivolous allegations supporting his or her prayer for relief; (2) whether the plaintiff will substantially benefit from the appointment of counsel; (3) whether there is a need to further investigate and present the facts related to the plaintiff's allegations; and (4) whether the factual and legal issues presented by the action are complex. *See Johnson v. Williams*, 788 F.2d 1319, 1322-23 (8th Cir. 1986); *Nelson*, 728 F.2d at 1005.

Plaintiff has demonstrated, at this point, that he can adequately present his claims to the Court. Additionally, neither the factual nor the legal issues in this case are complex. Thus, plaintiff's motion for appointment of counsel will be denied at this time.

Accordingly,

**IT IS HEREBY ORDERED** that, plaintiff Diamond Blair's motion to proceed in forma pauperis [ECF No. 3] is **GRANTED**.

**IT IS FURTHER ORDERED** that the plaintiff Diamond Blair shall pay an initial filing fee of $8.37 within thirty (30) days of the date of this Order. Plaintiff is instructed to make his remittance payable to "Clerk, United States District Court," and to include upon it: (1) his name; (2) his prison registration number; (3) the case number; and (4) that the remittance is for an original proceeding.

**IT IS FURTHER ORDERED** that if plaintiff Diamond Blair fails to pay the initial partial filing fee within thirty (30) days of the date of this Order, then this case will be dismissed without prejudice.

**IT IS FURTHER ORDERED** that the Clerk shall issue process or cause process to issue upon the complaint as to plaintiff's First Amendment retaliation claims against defendant Brian Boyer, in his individual capacity, as to plaintiff's claims of retaliatory transfer to Administrative Segregation on August 16, 2022 and giving plaintiff a false conduct violation.

**IT IS FURTHER ORDERED** that the Clerk shall issue process or cause process to issue upon the complaint as to defendants Brian Boyer, Michael Miller, Timothy Sellars and Edmund Jennings, in their individual capacities, as to plaintiff's claims of First Amendment retaliatory denial of return to the PC Unit on three occasions and retaliatory transfer to JCCC.

**IT IS FURTHER ORDERED** that defendants Brian Boyer, Michael Miller, Timothy Sellars and Edmund Jennings shall reply to plaintiff's claims within the time provided by the applicable provisions of Rule 12(a) of the Federal Rules of Civil Procedure.

**IT IS FURTHER ORDERED** that the Clerk shall not issue process or cause process to issue upon the complaint as to defendants Anne Precythe, Jeff Norman, Richard Adams, Crystal Schemitz, Tim Freeman and Chris Neiman because, as to these defendants, the complaint is legally frivolous or fails to state a claim upon which relief can be granted, or both.

**IT IS FURTHER ORDERED** that the Clerk shall not issue process on plaintiff's claims against defendants, in their official capacities, against Brian Boyer, Michael Miller, Edmund Jennings and/or Timothy Sellars because as to these claims, the complaint is legally frivolous or fails to state a claim upon which relief can be granted, or both.

**IT IS FURTHER ORDERED** that the Clerk shall not issue process on plaintiff's claims against defendants, in their individual capacities, against Brian Boyer, Michael Miller, Edmund Jennings, and/or Timothy Sellars for violations of his claims under the Fourteenth Amendment Due Process Clause because as to these claims, the complaint is legally frivolous or failure to state a claim upon which relief may be granted, or both.

**IT IS FURTHER ORDERED** that the Clerk shall not issue process on plaintiff's claims against defendants, in their individual capacities, against Brian Boyer, Michael Miller, Edmund Jennings, and/or Timothy Sellars for violations of the Fourteenth Amendment Equal Protection Clause because as to these claims, the complaint is legally frivolous or failure to state a claim upon which relief may be granted, or both.

**IT IS FURTHER ORDERED** that plaintiff William Blair is **STRICKEN** from this action as plaintiff Diamond Blair, who is acting pro se, may not represent another inmate in this action.

**IT IS FURTHER ORDERED** that the affidavits of inmates who are not parties to this action which are attached to the complaint, as well as the affidavit of David Gary docketed as a supplement to the complaint [ECF No. 8], are **STRICKEN** from this action as the Court does not

accept discovery documents unless attached to a motion or memorandum. *See* Local Rule 3.02 and Fed.R.Civ.P.7(a).

IT IS FURTHER ORDERED that plaintiff Diamond Blair's request for injunctive relief is **DENIED AS MOOT** as plaintiff was transferred to JCCC on February 7, 2023.

IT IS FURTHER ORDERED that plaintiff Diamond Blair's motion for appointment of counsel [ECF No. 2] is **DENIED at this time**.

IT IS FURTHER ORDERED that plaintiff Diamond Blair's motion to prosecute this action [ECF No. 12] is **DENIED WITHOUT PREJUDICE**.

IT IS FURTHER ORDERED that an appeal from this Order would not be taken in good faith.

A separate Order of Partial Dismissal shall accompany this Memorandum and Order.

Dated this 4th day of August, 2023.

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE